[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTUAL BACKGROUND
The facts of this case, jointly stipulated to by both parties are as follows: The legal framework within which this controversy arose is that established by relevant provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, et seq., and the Wagner-Peyser CT Page 4186-N Act, 29 U.S.C. § 49, et seq., which regulate the compensation and working conditions of foreign and domestic migrant farm workers. The Wagner-Peyser Act established an interstate clearance system[1] to provide employers with a means for recruiting workers from other states to meet local labor demand.[2] Employers seeking to hire temporary foreign workers under the Department of Labor's H-2 Visa Program [H-2],[3] are required to secure certification from the Department of Labor ("DOL") that qualified persons in the United States were not available to meet the labor demand and that employment of foreign workers would not adversely affect the wages and working conditions of similarly employed workers in the United States.[4] An employer who anticipates a labor shortage is required to file a "temporary labor certification application" with the local employment office. Included in the application is a clearance order which details the terms and conditions of the employment offered. If the DOL determines that the job offer meets regulatory standards, it is approved for circulation through the interstate clearance system. After the prescribed recruitment period is complete, the DOL either approves or denies temporary labor certification for the employer. If approved, the employer can then petition the Immigration and Naturalization Service for admission of temporary foreign workers. These foreign workers, and any U.S. workers recruited through the interstate system, are compensated according to the terms of the job offer. Thus all job offers by employers seeking to recruit temporary labor must comply with regulations governing the temporary labor certification process (H-2) and regulations governing the interstate clearance system.[5]
In 1991, the defendant, O.J. Thrall, Inc. ["Thrall"], a Connecticut corporation engaged in the planting, cultivation, and harvesting of shade tobacco, placed a clearance order with the DOL at the Boston Regional Office and the Connecticut Department of Labor ["Hartford Job Service"] pursuant to the Wagner-Peyser Act for the recruitment and referral of workers for its farm. Thrall sought to hire temporary foreign agricultural workers for the upcoming tobacco season, in anticipation that its hiring needs for the season would not be filled by the local labor market. CT Page 4186-O
Pursuant to the Wagner-Peyser Act, Thrall completed Form ETA-795, the clearance order, detailing the period of employment from June 10, 1991 to September 10, 1991 at a flat wage rate of $5.21 per hour. The job specifications detailed a variety of duties regarding the planting, cultivating and harvesting of shade tobacco. This clearance order was circulated among the satellite offices of the Department of Labor's Region 11, which includes Puerto Rico, in an attempt to find American workers to fill Thrall's employment needs. The Department of Labor in Puerto Rico recruited fifty-one persons, including the plaintiffs, Elvin and Edward Negron Nazario, who are residents of Yauco, Puerto Rico, to fulfill the order. The plaintiffs obtained and signed various documents in conjunction with their acceptance of Thrall's work order.
On June 5, 1991, the Puerto Rican Department of Labor faxed a letter of confirmation to both the Connecticut Department of Labor and Thrall stating that fifty-one airline seats were reserved for workers bound for the Thrall farm on June 11 and June 12, 1991. The plaintiffs arrived in Connecticut on June 12, 1991 and were met at the airport by a Thrall representative. They were transported to the Thrall farm at Windsor Connecticut and commenced working on or about June 13, 1991 in accordance with their employment contract. They worked at the farm until July 19, 1991 when they were discharged. They returned to Puerto Rico and instituted a breach of contract action against Thrall in the Superior Court at Ponce, Puerto Rico.
PROCEDURAL HISTORY
On July 13, 1992, the Puerto Rican Superior Court at Ponce rendered judgment for the plaintiffs under Rule 4.7 of the Puerto Rico Rules of Civil Procedure.[6] Thrall was properly served but did not appear. On July 13, 1992, the Superior Court at Ponce held that Thrall conducted business transactions in Puerto Rico and that it breached the clearance order and the farm labor contract existing between the parties.[7] Subsequently, the court awarded a default judgment in favor of the plaintiffs.[8] On September 7, 1993, the plaintiffs filed an application with this court seeking enforcement of this judgment CT Page 4186-P under the full faith and credit clause.
"Under the full faith and credit clause of the Constitution of the United States (article 4 § 1) and its implementing statute (62 Stat. 947, 28 U.S.C. § 1738), the judicial proceedings of a state must be given full faith and credit in every other state. The judgment rendered in one state is entitled to full faith and credit only if it is a final judgment, and the judgment is final only if it is not subject to modification in the state in which it was rendered." Krueger v. Krueger,179 Conn. 488, 490, 427 A.2d 400 (1980).
ISSUE
The issue before this court is whether a Connecticut defendant engaged in the hiring of migrant farm workers pursuant to the Wagner-Peyser Act had sufficient minimum contacts with Puerto Rico so that the exercise of long arm jurisdiction over said defendant, which resulted in a default judgment, is not violative of due process, and whether the Superior Court of Puerto Rico properly exercised in personam jurisdiction over the defendants so that its default judgment should be given full faith and credit in Connecticut.[9]
DUE PROCESS AND THE EXERCISE OF LONG ARM JURISDICTION — IN GENERAL
The present case challenges the validity of a foreign state's default judgment on a resident corporation thereby implicating the full faith and credit clause of the United States Constitution.[10] It is a case of first impression in the state of Connecticut.[11] The interpretation of the full faith and credit clause is a question of federal law and this court is "bound by the decisions of the Supreme Court of the United States concerning the criteria for application of the clause . . . . As a matter of federal law, the full faith and credit clause requires a state court to accord to the judgment of another state the same credit, validity and effect as the state that rendered the judgment would give it . . . .This rule includes the proposition that lack ofjurisdiction renders a foreign judgment void . . . . A party can therefore defend against the enforcement of a foreign judgment on the ground that the court that CT Page 4186-Q rendered the judgment lacked personal jurisdiction, unless the jurisdictional issue was fully litigated before the rendering court or the defending party waived the right to litigate the issue." (Citations omitted; emphasis added.) Packer Plastics, Inc. v. Laundon,214 Conn. 52, 55-6, 570 A.2d 687 (1990).
However, the United States Supreme Court has consistently held that, "the judgment of another state must be presumed valid, and the burden of proving a lack of jurisdiction rests heavily upon the assailant . . . . regardless of whether the judgment at issue was rendered after full trial on the merits or after an ex parte proceeding." (Citation omitted.) Id., 57.
"The Due Process Clause of the Fourteenth Amendment
limits the power of a state court to exert personal jurisdiction over a nonresident defendant. The constitutional touchstone of the determination whether an exercise of personal jurisdiction comports with due process remains whether the defendant purposefully established `minimum contacts' with the forum state."Asahi Metal Industry Co. v. Superior Court, supra (Footnote 9), "Jurisdiction is proper, however, where the contacts proximately result from actions by the defendanthimself that create a `substantial connection' with the forum State;" Burger King Corp. v. Rudzewicz, 471 U.S. 462,475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528
(1985) (quoting McGee v. International Life Insurance Co.,355 U.S. 220, 223, 78 S.Ct. at 201) (emphasis in original); or where the defendant has "deliberately engaged in significant activities within a state." Id., 476.
The Supreme Court in International Shoe Co. v. Stateof Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95
(1945) created a two-pronged test to assist courts in their exercise of personal jurisdiction over foreign corporations. According to the Court, the foreign corporation must have certain minimum contacts or ties with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Id., 316. Under InternationalShoe, supra, standard for imposing jurisdiction over a foreign corporation depends upon a measure of the CT Page 4186-R business' activity in the state coupled with the exercise of traditional notions of fair play. This test is not to be applied mechanically, but "must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure."International Shoe, supra, 319.
After International Shoe, the Court refined its definition of `minimum contacts.' In Hanson v. Denckla,357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court limited the minimum contacts necessary to confer jurisdiction to those activities where a foreign corporation "purposely avails itself of the privilege of conducting activities within the forum state." "[T]he facts of each case must be weighed to determine whether the requisite `affiliating circumstances' are present."Kulko v. California Superior Court, 436 U.S. 84, 92,98 S.Ct. 1690, 56 L.Ed.2d 132, reh'g. denied, 438 U.S. 908,98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978).
In Worldwide Volkswagen Corp. v. Woodson, 444 U.S. 286
(1980), the Court discussed the `stream of commerce' theory and rejected the argument that a state could exercise personal jurisdiction over two foreign corporations who had no direct activity in that state. The Court determined, based on the facts of the case, that the defendants "avail[ed] themselves of none of the privileges and benefits of Oklahoma law. They solicit[ed] no business there either through salespersons or through advertising reasonably calculated to reach the State." Id., 297. The Court further held that "[t]he forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." Id., 298.
In Asahi Metal Industry Co. v. Superior Court ofCalifornia, supra, the Court clarified its prior holdings and held that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State CT Page 4186-S . . . . [b]ut a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." (Emphasis added.)
SATISFYING `MINIMUM CONTACTS' IN THE ENFORCEMENT OF FOREIGN JUDGMENTS
The plaintiffs submit that the Puerto Rican default judgment was a valid exercise of personal jurisdiction. They cite the decision of the Superior Court at Ponce which concluded as a matter of law that the defendant conducted business transactions in Puerto Rico.[12] InNoon v. Calley and Currier Co., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 521514 (March 13, 1995, Norko, J.), the court analyzedInternational Shoe, supra, and its progeny and applied the following test to determine jurisdiction: "[whether] the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies."
The threshold issue before this court in order to enforce the default judgment in question is whether Thrall had the requisite minimum contacts with Puerto Rico to validate the Commonwealth's jurisdiction to properly render the default judgment. "The full faith and credit clause does not automatically transform a foreign judgment into a valid judgment in this state . . . . in order for a foreign judgment to constitute a valid judgment, it must be made a judgment in this state." (Citations omitted.) Cahn v. Cahn, 26 Conn. App. 720,730, 603 A.2d 759, cert. granted, 221 Conn. 924,608 A.2d 688 (1992). Section 52-604 of the Uniform Enforcement of Foreign Judgment Act defines "foreign judgment" as: "any CT Page 4186-T judgment, decree or order of a court of the United States or any other court which is entitled to full faith and credit in this state, except one obtained by default inappearance or by confession of judgment." (Emphasis added.) "It can be made a judgment there only if the court purporting to render the original judgment had power to render such a judgment. A judgment in one state is conclusive upon the merits in every other State, but only if the court of the first State had power to pass on the merits — had jurisdiction, that is, to render judgment." Krueger v. Krueger, supra, 491. "A court is without power to render a judgment if it lacks jurisdiction of the parties or of the subject matter, one or both. In such cases, the judgment is void, has no authority and may be impeached." Marshall v. Clark,170 Conn. 199, 205, 365 A.2d 1202 (1976).
Thrall raises three arguments in its trial brief for dismissal based on lack of personal jurisdiction. The first argument is that Thrall did not extend any offers of employment to the plaintiffs and therefore did not establish `minimum contacts' and is not liable under breach of contract theory. The second argument raised is that it granted no actual or apparent authority to the Yauco Department of Labor and therefore created no agency relationship upon which `minimum contacts' can be established. Finally, Thrall argues that it did not transact business and therefore did not have sufficient minimum contacts to establish in personam jurisdiction in Puerto Rico.
A. Clearance Orders As Offers of Employment
Research reveals that only thirty eight cases within the United States and Puerto Rico have discussed the Wagner-Peyser Act and the interstate clearance system.[13]
Of these, twelve cases have addressed the specific issue as to whether a clearance order is a `contractual offer of employment' and is subject to suit based on a breach of contract theory. In Rios v. Altamont Farms, supra, the court defined a clearance order as "a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers." InAguero v. Christopher, supra, 1273, the court stated as a CT Page 4186-U matter of fact that the "[d]efendants caused to be sent an offer of employment (Clearance Order N.D. 03-04, 970573) through the interstate employment service system to the Texas Employment Commission's office in Laredo, Texas." In Western Colorado Fruit Growers Association,Inc. v. Marshall, supra, the court held that a "[p]laintiff's clearance order is essentially an offer for a contract of employment." Id., 696. In Alvarez v.Joan of Arc, supra, the court analyzed the plaintiff's claims regarding a clearance order under Illinois contract law. In Neizil v. Williams, supra, the court recognized the clearance order as a contract for the purpose of determining venue.
In Frederick County Fruit Growers Association v.McLaughlin, supra, the court held that, "[t]he terms of a job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law . . . . An employer is expressly obligated to make those terms clear to his employees . . . . [t]he fact that the Growers may have failed to do so, or that for whatever reason the Farmworkers may never have been aware of the job clearance order amendment, in no way minimizes the Growers' contractual obligation in this context." (Citations omitted.) The court further found that the defendants breached their "contractual commitment" and were liable to the plaintiffs for lost wages. In27 Puerto Rican Migrant Farm Workers v. Shade TobaccoGrowers Agricultural Association, Inc., supra, the court recognized the clearance order as a "breach of a simple employment contract."
The remaining cases, Snake River FarmersAssociation, Inc. v. U.S. Dept. of Labor, supra, Rios v.Marshall, supra, Espinoza v. Stokely-Van Camp, Inc.,
supra, Alfred v. Okeelanta Corp., supra, and Lopez-Rivasv. Donovan, supra, recognize clearance orders as `job offers.' Only two cases declined to find that clearance orders are contracts or job offers.
In Chery v. Bowman, supra, the court declined to decide whether "clearance orders were contractual offers of employment." In Okeelanta Corp. v. Bygrave, supra, the court found that a separate contractual agreement between the parties was controlling over any language CT Page 4186-V found in the clearance order.
Thrall argues that "the consent of one party to a self-perceived but unknown and unintended `offer' of another party cannot be cognizable as a contract under the law of any jurisdiction . . . . Moreover, an offer must be made to a distinct party or number of parties, as controlled by the alleged offeror." (Citation omitted.) Trial Brief, p. 13. However, an examination of the clearance order at issue proves otherwise. Section 20 of the clearance order, submitted as Defendant's Exhibit A, entitled Employer's Certification, states "[t]his job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job." The signature of the Thrall's Vice President, Richard Bacon, appears beneath it. Appended to the order are attachments I and II which clearly lay out wage rates, pay periods, anticipated hours of work, housing, transportation, workers compensation, training, production standards and a termination clause. This court finds that the clearance order, signed and submitted by Thrall, constituted a unilateral contract containing an offer of employment. This court is persuaded by the holdings inWestern Colorado Fruit Growers Association, Inc. v.Marshall, supra, and Frederick County Fruit GrowersAssociation v. McLaughlin, supra, which held that, "[t]he terms of a job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law." The clearance order was an offer to enter into a unilateral contract which could only be accepted by performance. Thus, the clearance order served as an invitation to the plaintiffs to enter into an employment contract with Thrall. The plaintiffs' manifestation of their intent to accept the offer was concluded upon their arrival in Connecticut. The defendant's argument that it "did not intend the Clearance Order to be a contractual offer that could be accepted by mere consent," Trial Brief, p. 13, is irrelevant. Once the plaintiffs arrived in Connecticut and began working, they manifested their intent to accept Thrall's offer beyond `mere consent.' Further, Thrall's reliance on the court's holding in Lopez-Rivas v.Donovan, supra, is equally inapplicable as it is distinguishable from the instant case. In Lopez-Rivas,
CT Page 4186-W the plaintiff accepted the unilateral offer without authority from the Puerto Rico Employment Service and more importantly, the plaintiffs "were never hired" by the Defendant nor did they ever appear in the United States. Like Thrall, the defendants in that case "specifically requested in the job offers circulated that candidates be referred to their state local employment office." Id., 566.[14] Lopez-Rivas is clearly distinguishable from the instant case as the plaintiffs were not only hired by Thrall but worked for the Thrall corporation for approximately five weeks before being terminated.
Based on the facts as presented, this court is persuaded that Thrall's "clearance orders represented formal offers to contract with responding workers, containing all the essential terms and conditions of employment, including rates of pay, the date work was to begin and even provisions for financing transportation of workers . . . . [t]here can be no question whatsoever that in filing the orders in local [Connecticut] employment offices, [Thrall] deliberately set in motion the job recruitment machinery of the interstate clearance system. Thus [Thrall] did not merely acquiesce in the transmission of the clearance orders to other states and territories; [it] purposefully sent into the stream of interstate commerce a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers." Judge Levine's dissent in Rios v. Altamont Farms, supra. Accordingly, the circulation of the defendant's clearance order was a unilateral contract that was properly accepted by the plaintiffs.
 B. Circulation of Clearance Orders Creating an Agency Relationship
Thrall argues that the Yauco DOL Office was not an agent of Thrall and was not authorized to act on Thrall's behalf. "In order to engage the Yauco Office as their hiring agent, Defendants would have had to take some action that could be construed as manifesting an intent to create an agency relationship." Trial Brief, p. 18. CT Page 4186-X
Connecticut courts have determined that an agency relationship is created if, "(1) there is a manifestation by a principal that a person is acting for that principal, (2) there is acceptance by an agent of the relationship, and (3) there is an understanding that the principal is in control of the acts of the agent." State v. Smith, 90 Conn. App. 789,799 (1996). See also Gateway Co. v. DiNoia,232 Conn. 223, 240, 654 A.2d 342 (1995); Hall v. PeacockFixture Electric Co., 193 Conn. 290, 294, 474 A.2d 1100
(1984). To determine if the Wagner-Peyser Act creates an agency relationship, the court must review the legislative intent of the statute. "Although the finding of an agency relationship is ordinarily a question of fact . . . . unless the statutory scheme permits a finding of an agency relationship, there is no factual question to resolve." (Citations omitted.) Connecticut Air Service v.Danbury Aviation Commission, 211 Conn. 690, 697,561 A.2d 120 (1989).
"The Wagner-Peyser Act was passed in 1933 in order to deal with the massive problem of unemployment resulting from the Depression. The Act establishes the United States Employment Service within the Department of Labor "[i]n order to promote the establishment and maintenance of a national system of public employment offices." 29 U.S.C. § 49. State agencies, which have been approved by the Secretary of Labor, are authorized to participate in the nationwide employment services. Id., § 49g. The Secretary is authorized to make "such rules and regulations as may be necessary" to accomplish the ends of the Act." Alfred L.Snapp Son, Inc. v. Puerto Rico, ex rel. Barez, supra. "The obvious point of this somewhat complicated statutory and regulatory framework is to provide assurances to United States workers; including the citizens of Puerto Rico. First, these workers are given a preference over foreign workers for jobs that becomes available within this country. Second, to the extent that foreign workers are brought in, the working conditions of domestic employees are not to be adversely affected, nor are United States workers to be discriminated against in favor of foreign workers." Id., 596.
This court is of the opinion that there was a manifestation by Thrall that the Yauco DOL was acting on its behalf in the recruitment of workers. On the face of CT Page 4186-Y its clearance order, Thrall asks the holding office to refer applicants to the holding office.[15] The Yauco Office served as the delegated hiring authority. "The delegated hiring authority method is the method used by those employers who want the employment agencies to do the actual hiring of applicants instead of limiting their service to the usual referral of applicants, that is, the act of bringing to the attention of an employer an applicant or group of applicants who are available for specific job openings, 20 C.F.R. § 651.10 (1985), which is what the employment service system is designed to do and what, in fact, it generally does." Lopez-Rivas v. Donovan, supra. In Garcia v. Vasquez, supra, the court held that a North Carolina employer who had no regular place of business or designated agent in Texas, "purposefully issued the job information in North Carolina [via the clearance order]. The [Texas Employment Commission] merely acted on his behalf in processing the information. The privilege of conducting activities in Texas was intentionally invoked by [the defendant]."
Likewise in Neizil v. Williams, supra, the court found that the defendant "established minimum contacts with the State of Florida by conducting recruitment efforts in Florida by causing the transmittal of a clearance order to the Florida State Employment Service and specifying that a Florida farm labor contractor conduct recruiting and hiring on its behalf." As stated in Rios v. Altamont Farms,
supra, [t]he activities [the] defendants thus engendered were more than sufficient to satisfy the basic minimum criteria of International Shoe v. Washington, supra. For their commercial self-interest, defendants elected to import migrant workers through channels of interstate commerce." Id., 415.
Thrall used the interstate clearance system to recruit the plaintiffs and relied on the Yauco DOL as their `delegating authority' to process the applications and effectuate the employment arrangement. Consequently, the Yauco DOL was required by statute to enter this relationship. "An agency is defined as a contract, either express or implied, by which one of the parties confides to the other the management of some business, to be transacted in his name, or on his account, by which that other assumes to do the business, and to render an account of it. While CT Page 4186-Z an agency is thus generally the result of contract, express or implied, it is not always necessary to find all the elements of a contract in order to establish the relation. Even where one undertakes to act for another without compensation, and the element of consideration necessary for a contract is lacking, if he does in fact enter upon the undertaking, the relation of agency between him and the party for whom he is acting is created." (Internal quotation marks omitted.) Kurtz v. Farrington, 104 Conn. 257,268-9, 132 A. 540 (1926).
However, it is clear from the legislative history and relevant cases that the Yauco DOL, as an agent, was not under the control of the principal, Thrall. In WesternColorado Fruit Growers Association, Inc. v. Marshall,
supra, the court held that "the Secretary of Labor, the Employment and Training Administrator, and the INS are not intended beneficiaries of the interstate clearance system. The system is designed to bring two parties together: employers who have jobs and employees who need jobs . . . . Defendants, along with their state counterparts, are simply the intermediaries, the medium by which the employers and employees may find each other."
While the Yauco DOL considered Thrall's preferences during the employment search, "[e]mployers who utilize the system are required to offer certain minimum terms and conditions of work pursuant to DOL regulations. See generally 20 C.F.R. Part 653 (the "prevailing wage regulations"). The local office must ensure that the job offers comply with minimum terms and conditions of the DOL regulations. 20 C.F.R. § 653.501(c)." Morrison v. U.S.Dept. of Labor, supra, "Th[e] clearance order is reviewed by the state employment service and the regional offices of the DOL. In the case of agricultural workers, the order must meet the requirements of 20 C.F.R. § 602.9." Galindov. Del Monte Corp., supra. Thus, the Yauco DOL was not under the control of the principal, Thrall. "An essential factor in an agency relationship is the right of the principal to direct and control the performance of the work by the agent." McLaughlin v. Chicken Delight, Inc.,164 Conn. 317, 322, 321 A.2d 456 (1973). Thus, a statutory agency relationship did not exist between Thrall and the Yauco DOL. However, while this court does not find that a statutory agency relationship was created, it does find CT Page 4186-AA that an implied agency was created.[16]
Even though the defendants never signed designations of hiring authority, no formal agency relationship is required in order to hold defendants responsible for the acts of others on their behalf which they initiated through their communications." Rios v. Altamont Farms, supra. Thrall's reliance on Gelfand v. Tanner Motor Tours,385 F.2d 116 (2nd Cir. 1967), cert. denied, 390 U.S. 996
(1968), and Welinsky v. Resort of the World D.N.V.,839 F.2d 928, 929 (2nd Cir. 1988) in support of its argument that the plaintiff's agency theory could not give rise to jurisdiction, is unsupported. In these cases, the defendant voluntarily `did business' in the forum state. Thrall, in order to obtain an H-2 visa, was obligated by law to recruit in Puerto Rico. Thrall's assertion that "had the Yauco Office, or any other entity, been unable or unwilling to distribute the Clearance Order, Defendants had no intention of performing this task on their own," is unpersuasive. Trial Brief, p. 19.
As a point of information, these `tasks' were created as a result of the interaction of two federal statutes, the Wagner-Peyser Act, 48 Stat. 113, 29 U.S.C. § 49 et seq.,and the Immigration and Nationality Act of 1952,66 Stat. 163, as amended, 8 U.S.C. § 1101 et seq. The defendant's obligations of circulation "under the employment system established by the Wagner-Peyser Act stem from the Immigration and Nationality Act of 1952, insofar as it regulates the admission of nonimmigrant aliens into the United States. The latter Act authorizes the admission of temporary foreign workers into the United States "only if
unemployed persons capable of performing such service or labor cannot be found in this country." (Emphasis added.)Alfred L. Snapp Son, Inc. v. Puerto Rico, ex rel. Barez,
supra. It is unclear how Thrall intended to obtain an H-2 Visa without performing this `task' as required by law. It is clear that in order to obtain permission to recruit foreign workers, Thrall was obligated to make some effort to recruit workers in the United States. The circulation of job offers is a requirement, not an option, under the law. Thus, this court finds that the circulation of the clearance order determined that an apparent or implied agency relationship existed. CT Page 4186-BB
C. Circulation of Clearance Orders Creating `MinimumContacts'
The first prong of the International Shoe v.Washington, supra, test for deciding whether a forum State can exercise extraterritorial in personam jurisdiction is whether there are sufficient `minimum contacts' between the defendant and the forum State. Thrall argues that it has no corporate or other offices in Puerto Rico . . . never personally advertised for, recruited, or otherwise sought to employ Puerto Rican workers, either by acting from Connecticut or by entering the Commonwealth of Puerto Rico." Trial Brief, p. 11. Thrall further contends that it transact[ed] no business of any kind in Puerto Rico and has never personally availed [itself] of the Puerto Rican courts or government for any purpose." Id. While it concedes that it did file a clearance with the United States Department of Labor, it argues that it was required to do so in compliance with the H-2 Program and therefore did not purposefully avail itself of any services in Puerto Rico. Thrall further argues that "[t]his [was] not a voluntary act [and Thrall had] no control over the outcome of this act because they cannot control the distribution of or response to their Clearance Order." Id., 21-22. Thrall `stream submits that since it neither voluntarily entered the of commerce' nor controlled the distribution of its product, the clearance order, in any `purposeful manner,' it did not establish any minimum contacts in Puerto Rico. The plaintiffs argue that this case is factually similar toRios v. Altamont Farms, supra, and should be decided on the same grounds.
In Rios, the court held that a New York commercial apple farmer who submitted clearance orders to local employment offices for interstate recruitment of workers made a business judgment to seek foreign labor and is therefore amenable to judgment under the laws of that forum. On facts similar to those before this court, the Rios court held that a Puerto Rican default judgment is entitled to full faith and credit under New York law. Relying on Judge Levine's dissent in the trial court, the Court of Appeals held that in order to determine whether a forum State can exercise extraterritorial in personam jurisdiction, the court must weigh "the totality of the foregoing facts and not selective elements thereof." The CT Page 4186-CC court found that, "there can be no question whatsoever that in filing the orders in local New York State employment offices, [the] defendants deliberately set in motion the job recruitment machinery of the interstate clearance system. Thus, [the] defendants did not merely acquiesce in the transmission of the clearance orders to other states and territories; each of them purposefully sent into the stream of interstate commerce a legally operative written instrument to be used both as a means of recruiting out-of-State labor and as the basis for contracts of employment with responding workers." Id., 415. The court determined that the facts of the case supported the conclusion that the defendants had a substantial connection to Puerto Rico, thereby satisfying the first prong of the InternationalShoe, test.
The facts of that case suggested that the defendants were aware that their clearance orders had reached and were being acted upon in Puerto Rico and that they received communications concerning the progress of recruitment. Further, the court found that the defendants reaped substantial benefits from the forum state. It found that certain activities "performed by Puerto Rican governmental authorities were exclusively for [the] defendants' benefit. The screening of laborers' health and police records can hardly be considered to have been in the interest of anyone but [the] defendants." Id., 415. The court held that transportation arrangements made by the Puerto Rican government on behalf of the defendants evinced conduct sufficient to satisfy the minimum contacts criteria ofInternational Shoe. "For their own commercial self-interest, defendants elected to import migrant workers through the channels of interstate commerce. They further elected to take advantage of the expense-free hiring procedures of the interstate clearance system. These purposeful acts were undertaken with certain awareness that job offers would be disseminated and acted upon in Puerto Rico. They availed themselves of recruitment, screening and logistical services created under Puerto Rican laws and performed by Commonwealth employees. The conclusion is, therefore, inescapable that defendants purposefully and knowingly availed themselves of the benefits and protections established by Puerto Rican law." Id., 416.
The court further found that it was reasonable for the CT Page 4186-DD plaintiffs to bring suit in Puerto Rico as the "significant preliminary steps leading to [the] contract formation took place in Puerto Rico, including the performance of various conditions that defendants stipulated for in the clearance orders. These preliminary steps, including the making of commitments, obtaining medical and policy clearances, advancing the costs of air transport and actual embarkation, constituted either part performance or foreseeable detrimental action in reliance so as to have made defendants' offers irrevocable and legally binding before any plaintiff set foot in New York." Id.
The second prong to the International Shoe test requires the court to weigh the exercise of jurisdiction with traditional notions of fair play and substantial justice.
In Rios v. Altamont Farms, supra, the court found that when "comparing the relative burdens of litigation in a foreign jurisdiction and assessing the forum State's interest in the litigation, it more aptly might be said that fair play and justice demand that plaintiffs be permitted validly to litigate their claims in their home forum." The court, considering the economic impact on both parties to proceed in the forum state, concluded that "[i]t may reasonably be assumed that the common defense to all of the claims asserted by these plaintiffs would basically entail testimony from a few supervisory employees concerning defendants' justification for discharging plaintiffs. Imposing the burden of producing such witnesses in Puerto Rico hardly amounts to a denial of due process, when a converse ruling effectively would confer total immunity from suit upon defendants."
Likewise in Aguero v. Christopher, supra, the plaintiffs were migrant farmers from Texas who accepted employment in North Dakota. As required by the Wagner-Peyser Act, the clearance order was sent to the plaintiffs via the Texas Employment Commission, detailing the terms of employment, the hourly wages paid and the approximate number of work hours needed to perform the job. Upon returning to Texas, the plaintiff alleged they were underpaid what was promised and brought suit against the defendants. The defendants challenged venue on the grounds that the alleged breach of contract occurred in North CT Page 4186-EE Dakota. The court held that, "this place-of-injury approach is too simplistic in the context of Wagner-Peyser actions where Congress has a strong interest in protecting migrant laborers from abuse by their employers to the north."
In analyzing the Wagner-Peyser Act, the court opined that "Congress expressed a public interest in protecting the migrant laborers. As aptly described by Chief Judge Brown, the Act, quite obviously, was also intended to offer some protection to those employees who shift about the country to meet the needs of those employers who voluntarily use the resources of the federal government to secure workers . . . . It is well known that many migrant laborers do not have the financial resources necessary to prosecute a claim hundreds of miles from home. To require the Plaintiffs to prosecute this case in North Dakota would seriously dilute the Congressional effort to protect migrant workers." (Citation omitted; internal quotation marks omitted.) Aguero v. Christopher, supra. The court concluded that the clearance order served as an offer of employment sent to Texas and was accepted by the plaintiffs at the Texas Employment Commissions's Office in Laredo. The court held that, "[t]his contact with the forum district is rather significant in view of the nature of the Plaintiff's claim . . . . Because these `operative facts' occurred in Laredo, the Court finds that venue is proper in this district." (Citations omitted.) Id. The court held as an uncontroverted fact that submission of the clearance order into Texas was chosen by the defendants "as the convenient location to transact business with the Plaintiffs." (Citations omitted.) Id.
A number of cases adopted the court's holding in Riosv. Altamont Farms, supra and held that the circulation of clearance orders establishes `minimum contacts.' SeeGregory-Ayala v. Rinehart Orchards, Inc., supra; Surrillov. Drilake Farms, Inc., supra; Orchard Management Companyv. Soto, supra; Neizil v. Williams, supra, and Williams v.Tri-County Growers, Inc., supra.
In Williams, the court held that the "plaintiffs were recruited for work with Tri-County through a Clearance Order circulated by the defendant through the interstate service system and sent to Pennsylvania. There is no doubt CT Page 4186-FF that defendant purposefully availed itself of the privilege of conducting business in Pennsylvania in its recruitment of workers in the state. Due process, as defined by WorldWide Volkswagen Corp. v. Woodson, supra and its progeny, is simply not offended by subjecting defendant to suit in Pennsylvania."
In the present case, it is undisputed that Thrall submitted its clearance order into the interstate clearance system under obligation of law. The law, as represented by the Wagner-Peyser Act, required that Thrall exhaust American employment resources before hiring foreign workers. In this context, Thrall was required to exhaust their employment search in the United States and her territories (Puerto Rico) prior to obtaining temporary visas for foreign workers.[17] As perusal of the clearance order suggests, Thrall knew or should have known that its order would be circulated in Puerto Rico.[18] It engaged in business transactions with Puerto Rico in that it commissioned the Yauco DOL, through its clearance order, to recruit and screen applicants for the position. It was contacted by the Yauco DOL when this process was completed and was made aware of the plaintiffs intent to accept its unilateral offer of employment. Once these workers arrived in Connecticut, Thrall manifested its intention to fulfill its obligations under the contract when it transported these workers from Bradley Airport to its farm. Thrall knew or should have known that a contract for employment, which was circulated in Puerto Rico, used as a basis for recruitment in Puerto Rico and ultimately accepted in Puerto Rico by citizens of Puerto Rico, might be amenable to suit in Puerto Rico.[19] For this reason, Thrall's reliance on Chery v. Bowman, supra, and Lopez-Rivas v.Donovan, supra, is misplaced.
In Chery, the facts of the case established that the "contact created by the clearance orders was fortuitous, particularly since the [defendant] hired none of the plaintiffs as a result of the clearance orders being sent to Florida. Plaintiffs did not learn of [the defendant]'s clearance orders at a Florida employment office or through any efforts of the Department of Labor in Florida. [The plaintiff] learned of [the defendant's] employment needs while at a [Virginia] employment office . . . These circumstances were unaffected by the Virginia office's CT Page 4186-GG having sent [the defendant's] clearance orders to Florida." The Chery court limited and distinguished its holding from other cases where the defendant incurred a benefit or had "some contact with the forum state in addition to the circulation of clearance orders." Id., 1057.
In Lopez-Rivas v. Donovan, supra, the plaintiffs accepted a job offer in the form of a clearance order without authority by the Puerto Rico Employment Service. The court determined that the "defendants were [not] bound to give them employment" and that the plaintiffs' claim is "insufficient to sustain a substantial or plausible federal question claim under the Wagner-Peyser legislation." The court was careful to distinguish between these plaintiffs and others "who did in fact go to the farms in the continental United States and encountered the alleged discrimination. These allegations reflect an entirely different factual and legal scenario."
In Hanson v. Denckla, supra, the court required a showing that the defendant availed itself of the privilege of conducting activities in the forum State. In this case, Thrall availed itself, through the clearance order, the privilege of recruiting and screening job applicants pursuant to the Wagner-Peyser Act. This court is further persuaded that `affiliating circumstances' exist to support this inference. Kulko v. California Superior Court, supra, The clearance order entered the `stream of commerce' as detailed in Worldwide Volkswagen Corp. v. Woodson, supra. The circulation of the clearance order with Thrall's additional conduct (request to Yauco to screen and recruit applicants)[20] meets the requirements as outlined AsahiMetal Industry Co. v. Superior Court of California, supra. This court should and does adhere to the view expressed by the majority of cases around the country which have held that the circulation of clearance orders and recruitment satisfies the `minimum contacts' test as outlined inInternational Shoe.
The second prong of the International Shoe test requires a showing that jurisdiction is consistent with traditional notions of fair play and substantial justice. This court is persuaded that Puerto Rico was the proper forum for the litigation of this dispute. The court's holding in Rios v. Altamont Farms, supra, aptly summarizes CT Page 4186-HH the opinion of this court. "[O]n the basis of comparing the relative burdens of litigation in a foreign jurisdiction and assessing the forum State's interest in the litigation, it more aptly might be said that fair play and justice demand that the plaintiffs be permitted validly to litigate their claims in their home forum . . . . Imposing the burden of producing such witnesses in Puerto Rico hardly amounts to a denial of due process, when a converse ruling effectively would confer total immunity from suit upon the defendants . . . . The manifest and legitimate interest of Puerto Rico in obtaining redress for its citizens and protecting their contractual rights is also clear." (Citations omitted.)
Like Rios, in the present case, "[i]t may be reasonably assumed that the common defense to all of the claims asserted by these plaintiffs would basically entail testimony from a few supervisory employees concerning defendants' justification for discharging plaintiffs." Thrall argues that [i]t is certainly inconvenient for Defendants to be hauled into a court some 2,000 miles away from their domicile, for a proceeding which is convened in a foreign language, and in a small town in what may appropriately be considered by them to be a foreign country. Moreover, this inconvenience applies equally to every single witness that could be called by Defendants to support the notion that Plaintiffs were wrongfully terminated, since every such witness would be a Thrall employee from Connecticut." Trial Brief, p. 24-25. As both parties must suffer the same inconveniences, as between the two, the Thrall corporation, rather than the migrant workers, is in the better position to bear this burden. See Aguero v. Christopher, supra.
With respect to Thrall's `surprise and foreseeability' argument, the "general rule [of contract law] is that the validity and construction of a contract are determined by the law of the place where the contract was made." Jenkins v. Indemnity Insurance Co., 152 Conn. 249,253, 205 A.2d 780 (1964). The contractual terms and requirements, via the clearance order, were executed and accepted in Puerto Rico. The manifestation of this acceptance was the plaintiff's arrival in Connecticut. Thus, Thrall should have expected to litigate any contractual disputes in Puerto Rico as a general rule. CT Page 4186-II However, "if the contract is to have its operative effect or place of performance in a jurisdiction other than the place where it was entered into, our rule is that the law of the place of operative effect or performance governs its validity and construction." Id. This exception to the general rule raises questions of fact as to whether the contract was to have its `operative effect' or `place of performance' in Connecticut or Puerto Rico[21] which should have been raised by Thrall at trial in Puerto Rico and is now untimely.
Therefore, that the Superior Court of Puerto Rico at Ponce properly exercised in personam jurisdiction over the defendants pursuant to International Shoe and its progeny. As the rendering of the default judgment in favor of the plaintiffs did not violate the defendants' right of due process, the judgment may be enforced in Connecticut under the doctrine of full faith and credit.
Freed, J.